UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 01-1676(DSD/JSM)

John Zellner, Gerald L. Carlson, Robert H. Marty, Timothy Robinette, David Drury, Stephen M. Haley, Dale A. Knops, Patrick J. Sullivan, Robert E. Bremel, Jimmy W. Lee and James R. Tandberg,

Plaintiffs,

v. **ORDER**

Flint Ink Corporation, a foreign corporation, and Flint Ink North American Corporation, a foreign corporation,

Defendants.

Paul J. Lukas, Esq., Steven A. Smith, Esq. and Nichols, Kaster & Anderson, 4644 IDS Center, 80 South Eighth Street, Minneapolis, MN 55402, counsel for plaintiffs.

R. Scott Davies, Esq., Jason M. Hedican, Esq. and Briggs and Morgan, 2400 IDS Center, 80 South Eighth Street, Minneapolis, MN 55402, counsel for defendants.

This matter is before the court upon the motion of defendants Flint Ink Corporation and Flint Ink North American Corporation (hereafter "defendants" or "the company") for summary judgment. For the following reasons, defendants' motion is granted.

FILED OCT 31 2003
Richard D. Sletten, CLERK
Judgment Ent'd. ______ 2003
Deputy Clerk's Initials ____

**BACKGROUND**

Defendants manufacture commercial ink products. Among defendants' operations in the United States in its facility in St. Paul, Minnesota, which defendants acquired in 1991. Plaintiffs consist of eleven former employees whose jobs were eliminated in a reduction in workforce ("RIF") at defendants' St. Paul facility.

The St. Paul plant was a "mother plant" which produced standard ink products that were delivered to defendants' "blending plants" for further processing per customer order. Defendants came to believe that, due to its location, age and condition, the St. Paul plant was not economically viable as a mother plant and that its operations should be relocated to defendants' facility in Kentucky.[1] However, defendants believed that customer requirements in the Midwest could support a blending plant in Minnesota. Thus, the company proposed to convert the St. Paul facility to a blending plant.

In the fall of 2000, the company announced its intent to convert the St. Paul operation to blending. Defendants determined that the blending plant would require fewer employees than were needed to run a mother plant. With fewer workers and shorter lead times, it would be necessary for each employee to be able to perform every job function. Defendants believed that the need for

---

[1] The parties do not dispute that the decision to relocate was based on legitimate business concerns.

quick turnaround on customer orders also meant that overtime would be mandatory on some occasions.

A collective bargaining agreement covering fifty-six production workers was in effect at the time defendants decided to convert the St. Paul facility. The production workers, including plaintiffs, were collectively represented by the Paper, Allied-Industrial, Chemical and Energy Workers International Union and Local 7-528. Because the conversion to blending would require a RIF, representatives of the company and the union conducted "effects bargaining" to negotiate a RIF plan and to define a new job classification for the blending facility. See First Nat'l Maint. Corp. v. N.L.R.B., 452 U.S. 666, 674-75, 687-88 (1981) (holding that Labor Relations Act requires companies to negotiate with labor when proposed changes in operations will impact employees' terms and conditions of employment). The new position for the proposed blending facility was entitled "Combination Worker."

The company estimated that it would need eighteen production workers to operate the blending plant. The union represented approximately fifty-six St. Paul production workers at the time, meaning that thirty-eight jobs would be eliminated in the RIF. The union urged the company to fill all eighteen positions by seniority. The company sought to fill a certain number of the positions with hand-selected employees and to allow the rest of the

positions to be filled by seniority. It was agreed that the company would fill five of the positions by selection and the other thirteen would be filled by seniority. (Davies Aff. Ex. 6, Change in Operations Agreement, Art. 2.) The company and the union agreed that all eighteen of the retained employees would have to be able to perform the essential functions of the newly defined Combination Worker position. (Id.)

Some of the production workers, including plaintiffs, had medical restrictions limiting the duties they could perform or the number of hours they could work. In some cases, plaintiffs had been under restrictions for many years. (Pls.' Mem. in Opp'n to Defs.' Mot. for Summ. J. at 17-32.) Although the employees with restrictions were able to perform the essential functions of their former positions at the mother plant, it appeared that they would not be able to meet the requirements of the Combination Worker position.[2] A list of employees with restrictions was compiled. Union representatives met individually with each restricted employee and informed him or her that the restrictions could preclude their ability to perform the duties of the new Combination Worker position. The union told the restricted employees that if

---

[2] The agreed-upon essential functions of the Combination Worker position included, inter alia, possibly unlimited overtime, the ability to weigh, mix and package ink products, the ability to lift up to fifty pounds, the ability to perform computerized color matching and the ability to perform shipping and receiving activities. (Davies Aff. Ex. 6, Art. 2.)

they could not perform the essential functions of the position, they would not be considered for the job.

Based on the company's selections, the seniority list and their medical restrictions, plaintiffs were among the thirty-eight workers not selected for the eighteen available positions. Of the eleven plaintiffs, four had restrictions on both lifting and overtime (Carlson, Knops, Marty and Tandberg), four had restrictions on overtime (Bremel, Haley, Sullivan and Zellner), two had restrictions on lifting (Drury and Robinette) and one was physically limited by the inability to distinguish and match colors (Lee). (Pls.' Mem. in Opp'n to Defs.' Mot. for Summ. J. at 17-32.)

Through the effects bargaining process, the company agreed to give the employees who were not offered positions an incentive package. (Davies Aff. Ex. 6 at 3.) It also agreed to consider them for open positions at other company plants. (Id.) The company additionally offered to help pay moving expenses for employees transferring to other company plants. (Id.) The finalized Change in Operations Agreement, which also established the essential functions of the Combination Worker position, was ratified by the union. (Id. at 7.)

The St. Paul plant was not converted to blending after the mother plant operations were moved to Kentucky. Instead, a new blending plant was opened in Blaine, Minnesota. Because sales have been far below expectations, four more production jobs have been

eliminated and less overtime has been required than was originally expected. The Blaine facility has been running at approximately one-third its anticipated capacity.

Plaintiffs allege that in passing them over for the blending plant positions, defendants discriminated against them on the basis of actual or perceived disabilities, in violation of the Americans with Disabilities Act ("ADA") and the Minnesota Human Rights Act ("MHRA"). Because some of the plaintiffs' work restrictions were the result of workplace injuries, plaintiffs also allege obstruction of workers' compensation benefits pursuant to Minn. Stat. § 176.82. Defendants deny plaintiffs claims and now move for summary judgment.

## DISCUSSION

### I. Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In order for the moving party to prevail, it must demonstrate to the court that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v.

Catrett, 477 U.S. 317, 322 (1986)(quoting Fed. R. Civ. P. 56(c)). A fact is material only when its resolution affects the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. See id. at 252.

On a motion for summary judgment, all evidence and inferences are to be viewed in a light most favorable to the nonmoving party. See id. at 255. The nonmoving party, however, may not rest upon mere denials or allegations in the pleadings, but must set forth specific facts sufficient to raise a genuine issue for trial. See Celotex, 477 U.S. at 324. Moreover, if a plaintiff cannot support each essential element of its claim, summary judgment must be granted because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial. See id. at 322-23.

For disability claims arising under the ADA and MHRA to survive a motion for summary judgment, plaintiffs must make a prima facie showing disability discrimination. See Kiel v. Select

Artificials, Inc., 169 F.3d 1134, 1133-34 (8th Cir. 1999).[3] Because plaintiffs fail to so, summary judgment is appropriate.

**II. Disability Discrimination Claims**

The Americans with Disabilities Act ("ADA") protects disabled persons from employment discrimination based on their disability. See 42 U.S.C. § 12101. The Minnesota Human Rights Act ("MHRA") also prohibits employment discrimination against persons with disabilities. See Minn. Stat. § 363.03, subd. 1(2)(b) and (c). To establish a disability discrimination claim a plaintiff must prove:

---

[3] Under the familiar McDonnell Douglas "shifting burdens" analysis, once a plaintiff presents a prima facie showing of discrimination, the defendant is required to offer a legitimate, non-discriminatory reason for the adverse action. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). The plaintiff may then present evidence that the defendant's proffered reason is pretext. See id. Traditionally, if direct evidence of discrimination was presented, a plaintiff was permitted to proceed under the "mixed motive" theory established in Price Waterhouse v. Hopkins, 490 U.S. 228, 244-45 (1989). The plaintiff was then entitled to an instruction allowing the jury to find for plaintiff if it found that plaintiff's disability was a motivating factor in the employer's decision. See id.

The "shifting burdens" "mixed motive" dichotomy has been modified by the United States Supreme Court's recent decision in Desert Palace, Inc. v. Costa, 123 S. Ct. 2148, 2155 (2003). There, the Court held that a circumstantial showing of an impermissible motive for the employer's adverse decision entitles plaintiffs to the "mixed motive" instruction. See id. However, Desert Palace did not change the requirement, implicit in the summary judgment standard, that plaintiffs must make a prima facie showing of employment discrimination to overcome a motion for summary judgment. See Allen v. City of Pocahontas, Ark., 340 F.3d 551, 557-58 and n.5 (8th Cir. 2003) (noting that regardless the effect of Desert Palace on the McDonnell Douglas shifting burdens framework, to defeat a summary judgment motion, plaintiffs must still make a prima facie showing of discrimination by providing evidence from which a reasonable jury could infer a discriminatory motive for the employer's action).

(1) that he or she is disabled as defined by statue, (2) that he or she is qualified to perform the essential functions of the position, either with or without reasonable accommodation, and (3) that defendant took adverse employment action against him or her in a manner giving rise to an inference of unlawful discrimination.[4] See Heisler v. Metropolitan Council, 339 F.3d 622, 626-27 (8th Cir. 2003).

Under the ADA, a person is disabled if he or she suffers from a physical or mental impairment that substantially limits one or more major life activities. See 42 U.S.C. § 12102(2). Under the MHRA, a person is disabled if an impairment materially limits a major life activity.[5] See Snow v. Ridgeview Med. Ctr., 128 F.3d 1201, 1206 (8th Cir. 1997). A person may also be deemed disabled for purposes of the ADA or MHRA if he or she is "regarded as" having an impairment substantially limiting a major life activity. See 42 U.S.C. § 12102(2); Minn. Stat. § 363.01, subd. 13. "'[M]ajor life activities' include 'functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.'" Schuler v. Supervalu,

---

[4] Minnesota courts apply federal case law to disability discrimination claims brought under the MHRA. See Heisler, 339 F.3d at 626 n.3.

[5] The Eighth Circuit Court of Appeals found no distinction between the "substantial" limitation required under the ADA and the "material" limitation required by the MHRA. See Snow v. Ridgeview Med. Ctr., 128 F.3d 1201, 1206 (8th Cir. 1997).

Inc., 336 F.3d 702, 704 (8th Cir. 2003) (quoting 29 C.F.R. § 1630.2(i)).

Here, plaintiffs allege that they are substantially limited in the major life activity of working, or alternatively, that defendants regarded them as so limited. "A person is substantially limited in the major life activity of working if that person is 'significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities.'" Schuler, 336 F.3d at 704 (quoting 29 C.F.R. § 1630.2(j)(3)(i)).

Plaintiffs cannot show that they are substantially limited in the major life activity of working because each of them worked for defendants while under the very restrictions upon which their claims are based. Plaintiffs also allege that defendants regarded them as disabled. (Pls.' Mem. in Opp'n to Defs.' Mot. for Summ. J. at 36-41.) To prevail on that theory, plaintiffs must show that defendants' mistakenly believed plaintiffs had substantially limiting impairments when they did not, or that plaintiffs' existing impairments were substantially limiting when they were not. See Sutton v. United Air Lines, 527 U.S. 471, 489 (1999); Conant v. City of Hibbing, 271 F.3d 782, 785 (8th Cir. 2002). Plaintiffs' "regarded as" theory also fails. While defendants deemed plaintiffs unqualified for a particular job, that of

Combination Worker, the company did not regard them as so substantially limited that they were precluded from a broad range of jobs, as shown by defendants' continued employment of plaintiffs long after their medical restrictions began.

Plaintiffs point to a "cripples list" allegedly created by defendants and to statements allegedly made by company officials and others referring to plaintiffs as "cripps," "cripples" and "people like you" as evidence that defendants regarded them as disabled and as evidence of discriminatory bias. (Pls.' Mem. in Opp'n to Defs.' Mot. for Summ. J. at 15-16.) However, as offensive as statements of that sort may be, they do not show that defendants regarded plaintiffs as substantially limited in a broad range of job categories. Assuming, as the court must for present purposes, that such statements were made and that they were made by persons with appropriate decision-making authority, the statements would at most reflect defendants' belief that plaintiffs' medical restrictions precluded them from performing the duties of a Combination Worker.[6]

---

[6] No decision-maker is shown to have used the term "cripple" or "cripps," or to have referred to a "cripples list." Plaintiffs' brief either inadvertently or disingenuously quotes company District Manager Tom Orsello as saying the company was going to "get rid of all the cripps, cripples." (Pls.' Mem. in Opp'n to Def.s' Mot. for Summ. J. at 16, citing Drury Dep. at 68-69.) The quote was actually attributable to plaintiff Drury and was his paraphrase of what appears to be double hearsay. Drury admitted that the only reference he heard Orsello make was to "people with restrictions." (Drury Dep. at 69.)

Moreover, even if the alleged statements did show that defendants regarded plaintiffs as disabled, plaintiffs fail to meet the second element of a prima facie claim under the ADA. See Heisler, 339 F.3d at 626. The record demonstrates that plaintiffs were not qualified to perform the essential functions of the Combination Worker position, as defined in the Change in Operations Agreement negotiated by the union and the company. Among the essential job functions are the ability to work overtime to meet customer requirements, to lift up to fifty pounds and to color match the ink products. (Davies Aff. Ex. 6, Change in Operations Agreement, Art. 2.) There is no dispute whether, at the time the decision was made to reduce the workforce, plaintiffs were under existing medical restrictions prohibiting them from performing these essential duties.

Because plaintiffs fail to show that they are disabled within the meaning of the ADA, that defendants regarded them as disabled or that they are qualified for the only available position at the new blending facility, they have not made a prima facie showing of disability discrimination under the ADA or MHRA. Summary judgment on those claims is therefore appropriate.[7]

---

[7] Because the court grants defendants' motion on the basis of plaintiffs' failure to make its prima facie case, it does not address defendants' assertion that the MHRA claim is barred by the exclusive remedies provisions of the Minnesota Workers' Compensation Act. See Minn. Stat. § 176.031; Karst v. F.C. Hayer Co., Inc., 447 N.W.2d 180, 186 (1989).

**III. Obstruction of Worker's Compensation Benefits**

Plaintiffs also allege that defendants violated Minnesota workers' compensation law. Minnesota Statutes § 176.82 prohibits retaliatory discharge of employees seeking benefits under the Minnesota Workers' Compensation Act. See Minn. Stat. § 176.82, subd. 1. The statute also requires that employers offer continued work to such employees "when employment is available within the employee's physical limitations." Minn. Stat. § 176.82, subd. 2. The statute specifically states that "[i]n determining the availability of employment ... the provisions of any collective bargaining agreement shall govern." Id. For the reasons discussed above, plaintiffs' cannot show that employment within their physical limitations was available at the planned blending plant.

Plaintiffs argue that defendants did not give them an opportunity to have their restrictions lifted or modified. They also assert that after the blending plant opened, overtime, lifting and color identification were less essential than had been anticipated. These arguments are unavailing. Plaintiffs make much of defendants' acceptance of plaintiffs' doctor-ordered work restrictions at face value, but fail to explain why defendants should not have done so. Plaintiffs' argument implies that they should receive the benefit of restricted duties and the protections

of Minn. Stat. § 176.82, but that they should also be allowed to abandon those restrictions whenever it suits them. The court finds that argument implausible and unsupported in the law.

Plaintiffs' argument that the overtime, lifting and color identification functions were not really essential functions of the Combination Worker position disregards the collectively bargained-for Change in Operations Agreement, which by statute is controlling in this instance. See Minn. Stat. § 176.82, subd. 2. (stating "the provisions of any collective bargaining agreement shall govern."). Therefore, defendants' motion for summary judgment is granted as to plaintiffs' Minnesota workers' compensation claim as well.

**CONCLUSION**

For the foregoing reasons, **IT IS HEREBY ORDERED** that defendants' motion for summary judgment [Doc. No. 13] is granted.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: October 31, 2003

David S. Doty, Judge
United States District Court